IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
**Southern Division**

FILED _HE_ ENTERED
LODGED _____ RECEIVED

APR 16 2018

AT  GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

**UNITED STATES OF AMERICA,**

                         **Case No.: GJH-17-528**

**v.**

**DARIUS WILDER,**

    **Defendant.**

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

**MEMORANDUM OPINION**

Defendant Darius Wilder faces charges of Felon in Possession of an Explosive, 18 U.S.C. § 842(i)(1); Malicious Use of Fire to Damage Property Affecting Interstate Commerce, 18 U.S.C. § 844(i), and Possession of a Destructive Device During and In Relation to a Crime of Violence, 18 U.S.C. § 924(c)(1)(B). These charges stem from allegations that Wilder used an improvised incendiary bomb to start a small fire on the balcony of a second floor garden-style apartment on April 15, 2017. While in police custody, law enforcement officers interrogated Wilder about the fire and obtained a confession. Wilder now moves to suppress his incriminating statements, alleging that the officers intentionally minimized the severity of the punishment he now faces, thereby coercing an involuntary confession in violation of his Fifth Amendment rights set forth in *Miranda v. Arizona*, 384 U.S. 436 (1996). For the reasons that follow, Defendant's Motion to Suppress, ECF No. 31, is denied.

**I.      BACKGROUND**

On October 11, 2017, the Government filed the Indictment in this case charging Wilder with the above-referenced federal offenses. ECF No. 24. On January 15, 2018, Wilder filed a motion to suppress statements made to police and fire officials on the evening of April 18, 2017

while Wilder was being treated in the emergency room at MedStar Montgomery Hospital (or, "Montgomery General"). ECF No. 31. The Government opposed the motion, ECF No. 33, and an evidentiary hearing was held on March 12, 2018. ECF No. 41.

At the hearing, the Government presented four witness: Montgomery County Police Officer Robert Atack, who provided testimony regarding Wilder's initial arrest and interview at Montgomery General; Montgomery County Fire and Rescue Paramedic Christopher Miller, who provided testimony regarding Wilder's medical condition during transport from the scene of arrest to Montgomery General; Dr. Michael Perline, who provided testimony regarding Wilder's treatment in the emergency room at Montgomery General; and Lieutenant William Olin from Montgomery County Fire and Rescue, who provided testimony regarding Wilder's interview at Montgomery General. The Court found each of the Government's witnesses to be credible. Wilder also provided testimony regarding his account of the events that transpired immediately prior to his initial arrest through his interview. In addition, the Government provided the Court with an audio recording and transcript of the subject interview that Wilder seeks to suppress herein, which the Court reviewed in chambers.

Atack testified that he is currently assigned to the 6th District's Special Assignment Team ("SAT") and has been on that team for the past four years. As a member of SAT, Atack performs field work and case enhancement alongside police detectives. On April 18, 2017, Atack was contacted by the Montgomery County Police Department's Domestic Violence Unit and dispatched to Wilder's residence, 911 Brick Manor in Silver Spring, Maryland, to arrest Wilder, who had three outstanding misdemeanor warrants and was a suspect in an April 15, 2017 fire. Atack observed Wilder exit the residence and enter into a vehicle parked across the street. Atack then made the decision to "take him down" and, with the help of another officer in a separate

vehicle, proceeded to block Wilder's avenues of escape by stopping his vehicle short of Wilder's vehicle and turning on his lights. Wilder backed his vehicle into Atack's, and after his vehicle became stuck, exited the vehicle and began to run back towards his residence. After a brief foot chase, Wilder complied with police orders, went down to the ground, and was placed under arrest. Once arrested and searched, the police officers found a bag of crack cocaine on Wilder's person. Thereafter, Wilder complained of chest pain and Atack called for medical assistance, which arrived in approximately ten minutes and transported Wilder to Montgomery General via ambulance. Atack followed the ambulance to the hospital, while another officer, Officer Amaya, rode with Wilder.

Miller testified that he has been a licensed paramedic for four years, and on April 18th, he responded to Atack's call for service at 911 Brick Manor. Miller arrived at the scene and found Wilder standing on the sidewalk, and Wilder informed him that he was having chest pains, was concerned about his heart, and wanted to go to the hospital. Miller observed that Wilder appeared alert and oriented, with no apparent difficulty in understanding or answering his questions. Wilder entered the ambulance under his own power, and Miller assessed his vital signs and found that while Wilder did not exhibit any of the typical presentations of a heart attack, he had an elevated pulse. Miller proceeded to the hospital in the back of the ambulance along with Wilder and Amaya and described the incident as "a pretty mundane call," noting that it was a priority three (low priority).

Dr. Perline testified that he was the attending physician at Montgomery General's emergency room responsible for Wilder's treatment on the evening of April 18th. Dr. Perline has been an attending physician in this emergency room for two years and has been board certified in emergency medicine for over twenty years. Dr. Perline did not remember his encounter with

3

Wilder but provided testimony based on Wilder's emergency room records. *See* Government

Exhibit 8. As set forth in the records, Wilder complained of chest pain and displayed an elevated

heart rate; however, Dr. Perline documented that Wilder was well appearing with no apparent

distress, was not sweating, did not have trouble breathing, was neurologically alert, and did not

display any visible markers of a heart attack or another acute life threatening event. Dr. Perline

documented Wilder's condition as stable at 8:18 p.m., and Wilder was discharged into police

custody at 9:27 p.m.

Atack further testified that once he arrived at Montgomery General, he remained in

Wilder's hospital room as he waited for Olin. Wilder had one wrist handcuffed to his bed, was

seated in an elevated position, and appeared coherent and calm. Once Olin arrived, Olin

administered the Montgomery County Police Department's Advice of Rights form to Wilder,

which was then signed by Atack, Olin, and Wilder.[1] *See* Government Exhibit 10.

Olin, a fire and explosives investigator who has been employed with Montgomery

County Fire and Rescue since 1999, testified that he was involved in the investigation into the

April 15th fire. On that day, he responded to a fire on a second floor balcony of a garden style

apartment, where he found that a small fire had burned some bikes and charred a small portion of

the floor, but did not spread from the balcony into the apartment. Wilder was a suspect, and, on

April 18th, Olin was informed that Wilder had been arrested on outstanding warrants, so Olin

---

[1] The Advice of Rights form sets forth six statements as follows, each requiring response by the suspect indicating
that it has been read to them:
1. You have the right now and at any time to remain silent.
2. Anything you say may be used against you.
3. You have the right to a lawyer before and during any questioning.
4. If you cannot afford a lawyer, one will be appointed for you.
5. You have the right to be taken promptly before a District Court Commissioner who is a judicial officer not
connected with the police. A Commissioner will inform you of each offense you are charged with and the
penalties for each offense; provide you with a written copy of the charges against you; advise you of your
right to counsel; make a pre-trial custody determination; and advise you whether you have a right to a
preliminary hearing before a judge at a later time.
6. Do you understand what I have just said?
*See* Government Exhibit 10.

responded to Montgomery General to interview him. Olin arrived at the hospital at approximately 7:15 p.m. and entered Wilder's hospital room approximately an hour later. After executing the Advice of Rights form, Olin proceeded to interview Wilder about the April 15th fire. Notably, Olin recorded the interview but did not turn on his recording device until after he had administered the Advice of Rights.

There was no testimony offered during the hearing regarding what, if anything, Wilder was told would be the subject matter of the interview prior to the execution of the Advice of Rights form, but Olin did testify that he introduced himself to Wilder as a fire and explosives investigator. Olin testified that while he knew he was investigating felony charges, he did not inform Wilder of the gravity of the charges. And while he did not affirmatively tell Wilder that he was *not* in trouble, offer Wilder leniency in exchange for his cooperation, or promise that he would not bring felony charges against him, Olin repeatedly emphasized that he was investigating a "small" fire. Atack also occasionally participated in the interview and suggested that the fire was small, only damaging some bicycles. Both officers acknowledged that during the interview, each minimized the seriousness of Wilder's alleged conduct in an attempt to obtain information from him. For example, Olin stated that "the fire was very small. . . . So, from that standpoint, you know, it's a good thing. For whoever did it. . . . I like keeping this very simple, and on the down-low." *See* Interview 1 Transcript at 36. Atack suggested to Wilder that "if you made a mistake, we, we can deal with mistakes" and stated "[d]id you do anything . . . you regret over there? Now's the time. You, you're getting that opportunity here, Darius. You're not gonna get many opportunities." *See* Interview 1 Transcript at 39, 42.

Finally, Wilder provided testimony characterizing his recollection of his arrest, transport to the hospital, and resulting interview. Wilder stated that on the way to the hospital, Amaya did

not discuss the subject fire but offered to drop any charges associated with the cocaine found on Wilder if Wilder cooperated and provided information regarding the drugs. Wilder agreed. Wilder did not remember being read his rights at the hospital. Wilder further stated that he remembered signing his hospital discharge paperwork but not signing the Advice of Rights form, although he acknowledged that the signature on the form looked like it was his signature. Wilder further testified that he only admitted to having any involvement in the fire after getting a "bad vibe" from Olin and Atack and assumed that, similar to his conversation in the ambulance with Amaya, if he told the investigators what he thought they wanted to hear, he would be released on bond and would be able to later prove his innocence. Wilder stated that had he known he was facing the charges set forth in the Indictment, he would not have admitted to having any involvement in the April 15th fire.

## II.    DISCUSSION

The Fifth Amendment privilege against self-incrimination provides that "[n]o person. . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amendment V. In *Miranda v. Arizona*, the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to custodial interrogation. 384 U.S. at 444; *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (reaffirming Miranda as "a constitutional rule."). Before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, and that he has the right to an attorney during questioning. *Id.* "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda* . . . and the defendant knowingly, intelligently, and voluntarily waives those rights." *United States v. Giddins*, 858 F.3d

6

870, 879 (4ᵗʰ Cir. 2017) (internal citations omitted). Thus, in considering Defendant's motion to suppress the statements he made during a custodial interrogation, the Court must consider two issues: first, as a factual matter, was a *Miranda* warning given, and second, if so, did Wilder make a knowing, intelligent and voluntary waiver?

## A. Did the Defendant Receive a *Miranda* Warning?

There is no dispute that Wilder was subject to custodial interrogation when he was interviewed by Olin and Atack, and any statements made during the interview must therefore be suppressed if they were made in the absence of a *Miranda* warning. The government bears the burden of establishing, by a preponderance of the evidence, that Olin and Atack advised Wilder of his rights. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Here, the government has set forth credible testimony from Olin and Atack confirming that a *Miranda* warning was given, and provided an Advice of Rights form signed by Wilder, Olin and Atack. Thus, the government has met its burden.

Despite the fact that the reading of the *Miranda* warnings was not recorded, the Court does not credit Wilder's testimony that they were not provided. *See United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014) (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993) ("the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.")). Wilder acknowledged that his signature is on the Advice of Rights form but stated that he did not remember signing it, without providing any explanation as to how his signature found its way on to the form. In addition, Wilder stated that he confessed to the crime because he thought he would be facing a small charge and that he could then prove his innocence once released on bond. The notion that he would provide evidence of the crime (in the

7

form of a confession) with the later objective of proving his innocence is nonsensical, and the Court cannot credit it or his testimony as a whole.[2] Therefore, the Court finds that Wilder was advised of his *Miranda* rights.

## B. Were the Waiver and Confession Voluntary?

A finding that Wilder was advised of his *Miranda* rights does not end the Court's inquiry as Wilder's waiver and subsequent confession "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Additionally, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.*; *see also United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012) (citing *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997) ("A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under [*Miranda*], and the defendant knowingly, intelligently, and voluntary waives those rights.")). The Government bears the burden of proving by a preponderance of the evidence that any statements were voluntarily made. *Giddins*, 858 F.3d at 881. Wilder asserts that his waiver was not voluntary because of his medical condition during the interview and that the officers' interrogation tactics coerced him to make the incriminating statements. The Court will consider both arguments.

---

[2] Defense argues that the fact that the *Miranda* warnings were not recorded, despite the recording of the actual interview, is compelling evidence that the *Miranda* warnings were not actually given. Olin testified that he felt that there was no need to record the Advice of Rights exchange as it was performed in the presence of another officer and contemporaneously documented. Although it may be better practice to record the *Miranda* warnings when possible, in evaluating the testimony of all relevant witnesses, and the existence of a signed Advice of Rights form, the Court finds that the *Miranda* warnings were given despite the fact that it was not recorded.

First, at the motion hearing, Wilder seemed to abandon his claim that his medical condition caused him not to be of sound mind when waiving his *Miranda* rights in the hospital. And for good reason—the evidence from the officers and medical staff all indicate that he was coherent, oriented, and alert throughout the arrest, interview and discharge from the hospital. Although Wilder was not discharged from the hospital prior to undergoing the interview, Dr. Perline's observations recorded at 8:14 p.m., shortly before the interview began, noted that Wilder was in no apparent distress. *See* Government Exhibit 8 at 3. By Wilder's own account, he was engaged in casual, light-hearted conversation with Atack before Olin had arrived to start the interview. Aside from an elevated heart rate, Wilder did not exhibit any notable medical conditions, and the evidence makes clear that Wilder was fully capable of making a voluntary, knowing, and intelligent waiver of his *Miranda* rights.

Second, Wilder claims that by minimizing the offense and potential consequences, the officers coerced his *Miranda* waiver and confession through the use of deception making both involuntary. There can be little doubt from listening to the interrogation that the officers here used interrogation tactics that have been in police playbooks since prior to the Supreme Court's 1966 decision in *Miranda*. Indeed, there, the Court discussed police manuals then in use to assist police detectives in obtaining confessions, noting that one such manual instructed the following:

> The guilt of the subject is to be posited as a fact.[3] The interrogator should direct his comments toward the reasons why the subject committed the act,[4] rather than court failure by asking the subject whether he did it. Like other men, perhaps the subject has had a bad family life, had an unhappy childhood, had too much to drink, had an unrequited desire for women. *The officers are instructed to minimize the moral seriousness of the offense,*[5] to cast blame on the victim or society. These tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already – that he is guilty.

---

[3] *See* Interview 1 Transcript at 39 (Olin explaining to Wilder that picture of suspect provided by witnesses was a "spitting image" of him).

[4] *See id.* at 45 ("were you just trying to scare her? Was this, uh, like a scare tactic?").

[5] *See id.* at 39 ("if you made a mistake, we, we can deal with mistakes.").

9

*Miranda*, 384 U.S. at 450 (emphasis added). It is precisely because of the near ubiquitous use of such tactics that the prophylactic warnings of *Miranda* were originally found to be necessary. *Id*. at 467 ("We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."). But here the Court has found that *Miranda* warnings were given and waived; thus, the relevant inquiry is whether coercive police activity led to an involuntary waiver or confession. *Giddins*, 858 F.3d at 881 ("Coercive police activity is a necessary finding for a confession or a *Miranda* waiver to be considered involuntary.").

Unfair coercion can be found when there has been affirmative deceit by the interrogating officers. *Id.* at 883. A "failure to inform [a] defendant that he was the subject of the investigation . . . [when the] defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead" can result in affirmative deceit. *Id*. (quoting *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983) (alterations in *Giddins*)). "In order to prevail on such a claim, the '[d]efendant must . . . prove the misinformation was material in his decision to speak with the [police],' and 'produce clear and convincing evidence that the [police] affirmatively misl[ed] him as to the true nature of their investigation.'" *Id*. at 884 (quoting *Serlin*, 707 F.2d at 956) (alterations in *Giddins*).

Wilder relies on *Giddins* to argue that the officers' attempts to downplay the severity of the alleged conduct resulted in a coerced confession in violation of the Fifth Amendment. *Giddins* is distinguishable, however. In *Giddins*, the Fourth Circuit suppressed coerced statements made by Giddins, a suspect in a series of bank robberies, after police officers

10

repeatedly insinuated that Giddens was neither in trouble nor the subject of their investigation.[6] *Id.* at 884. Prior to making incriminating statements, Giddins had voluntarily reported to the police station to retrieve his car, which he was told had been used in the robberies. *Id.* at 875. Upon arrival, Giddins was taken into an interview room and questioned about the robberies; however, the officers' conduct suggested that they were questioning him so that he could get his car back, not because he was a subject in the investigation. Notably, in response to Giddins's question of "Am I in trouble?" an officer replied, "No, you're here getting your car right?" *Id.* at 876. And while the officers eventually presented Giddins with a *Miranda* waiver, the officers continued to suggest that Giddins was not in trouble, indicating that they had to read him his rights "because his car was involved in a crime." *Id.* Based on such exchanges, the Fourth Circuit found that the officers "affirmatively misled" Giddins as to the true nature of their investigation, and that the officers' conduct was material in Giddins's decision to speak. *Id.* at 884. Thus, "the police coercion was sufficient to rise to the level such that Giddins's will was overborne or his capacity for self-determination critically impaired," making the waiver and statements involuntary. *Id.* at 885.

Here, the officers made no such effort to affirmatively deceive Wilder. Indeed, there is no testimony on the record as to any information that had been provided to Wilder prior to his *Miranda* waiver other than that he was clearly under arrest and was being interviewed by a fire and explosives investigator. Wilder was never advised, nor did the officers suggest, that he was not in any trouble. Although, during the interview, the officers couched Wilder's alleged involvement in the fire as a "mistake" and frequently referred to the incident as a small fire that

---

[6] Additionally, but unrelated to the instant case, the Fourth Circuit held that Giddins's interview was a custodial interrogation and his resulting admissions were, in part, the result of "economic coercion," because a reasonable person may have believed he would not get his car returned from policy custody if he did not sign a *Miranda* waiver and answer the questions. *United States v. Giddins*, 858 F.3d 870, 879, 883 (4th Cir. 2017).

11

burned some bicycles,[7] the officers made clear that they thought Wilder was responsible.

Additionally, during the interview, Wilder was under no allusion that he was *not* the subject of

the officers' investigation into the April 15th fire. At the outset of the interview, Olin indicated

that he was speaking with Wilder regarding a fire at his significant others' residence and that

"it's come to [Olin's] attention that you've had some issues . . . with your significant other." *See*

Interview 1 Transcript at 2. Certainly based on the tone of the interview, it is more than plausible

that Wilder did not realize he would later be facing the potential consequences he now faces, and

it is likely that the officers' tactic of minimization was effective in eliciting his incriminating

responses. But the Court cannot find that this tactic, coupled with Wilder's understanding that he

was facing *some* charges, meets the level of deception and coercion prohibited by *Giddins*.

    "While courts may consider whether the defendant knew the nature of the offense under

investigation in determining voluntariness," investigators have no "duty to advise [the suspect]

of the identity of the specific offense under investigation." *See United States v. Braxton*, 112 F.

3d 777, 784 (4th Cir. 1997). Although Wilder claims that his confession was based on an

assumption that he would receive a minor charge, it was only an assumption—the officers' did

not promise him leniency in exchange for his information or make any affirmative misstatements

regarding his criminal liability.[8] *See United States v. Olmstead*, 698 F.2d 224, 226–27 (4th Cir.

1983) (holding that law enforcement was not required to correct suspect's erroneous assumption

that, as a condition of talking with the law enforcement, his statements would not be used against

him in any way). While the officers' minimization of the consequences of the April 15th fire

---

[7] Although he has been charged with very serious offenses carrying severe penalties, it is not at all clear that the officers' description of the facts of this case to Wilder as involving a relatively small fire that damaged some bicycles is materially inaccurate. *See United States v. Serlin,* 707 F.2d 953, 957 (7th Cir. 1983). ("A true statement cannot be equated with affirmative deceit.").

[8] Notably, Wilder was told, through the Advice of Rights exchange, that "A Commissioner will inform you of each offense you are charged with and the penalties for each offense." *See* Government Exhibit 10.

may have put Wilder at ease, he made a conscious decision to waive his *Miranda* rights and provide incriminating statements. And even though the severity of the charges Wilder now faces exceeds that which he might have expected for admitting to a "mistake," this fact alone is insufficient to show that Wilder's will was overborne and his capacity for self-determination critically impaired by coercive deception by the officers. There is no indication that Wilder was affirmatively deceived prior to waiving his *Miranda* rights, and prior to making inculpatory statements, he clearly knew he was being interrogated about a fire he was suspected of starting. Therefore, the Court finds that Wilder made a knowing, intelligent, and voluntary waiver of his rights after being provided with a *Miranda* warning and his confession was voluntarily given.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress, ECF No. 31, shall be denied. A separate Order follows.

Dated: April 16, 2018

GEORGE J. HAZEL
United States District Judge